UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

     Plaintiff,

                            Case No. 16-20222
v.                            Hon. Arthur J. Tarnow

RONALD MILLER,

     Defendant.

_____/

### United States' Response and Brief in Opposition to Defendant's Motion for Release

The response to defendant Ronald Miller's motion for release from the Bureau of Prisons based on COVID-19 should be "maybe—but not yet, and not in this forum." Late last week, Congress and the President enacted legislation, and the Attorney General issued a directive, enabling and instructing the Bureau of Prisons to increase the number of federal inmates released into home confinement during the COVID-19 pandemic. Given Miller's age and medical conditions, it is likely that he will be considered for home confinement under that new authority.

But Miller is by no means the only federal inmate under consideration for release. The Bureau of Prisons is urgently evaluating its entire prison population right now and attempting to determine

which inmates are eligible for home confinement, are most at risk from COVID-19, and pose the least risk to the public. That process requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, quarantine each of them for 14 days, and arrange for location monitoring. This necessarily requires prioritizing the most pressing cases, and Miller should not be permitted to line-jump other, more vulnerable and less dangerous inmates just by petitioning the Court.

The Court also does not have jurisdiction to order Miller's release. The home-confinement statutes do not provide for judicial review of the Bureau of Prisons' decisions—much less preemptively. And because Miller has not sought compassionate release from the Bureau of Prisons based on COVID-19, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not have jurisdiction to address his argument on that point. Nor, in any event, do Miller's age and medical conditions qualify him for compassionate release under that statute.

.

## Background

Beginning in around 2012, Miller led and organized a drug-trafficking operation, relying on several cohorts to retrieve, deliver, package, and sell drugs to end users. During the course of the conspiracy, Miller's operation distributed more than a kilogram of heroin and multiple kilograms of cocaine. Despite his prior felony conviction, Miller also armed himself with a firearm—which agents later recovered from his house—to protect himself while distributing drugs. Miller was not a young man when he committed this offense, either. He was in his early 60s.

Miller pleaded guilty to conspiracy to distribute heroin and to being a felon in possession of a firearm. His guideline range was 135–168 months in prison. But given Miller's age and health conditions, the United States recommended a downward variance and suggested 96 months as an appropriate custodial sentence. Miller asked to be sentenced to no more than the mandatory minimum of 60 months. The Court ultimately sentenced Miller to 72 months in prison. Miller, now 69 years old, is serving his sentence at FCI Butner, a Bureau of Prisons

facility in North Carolina. To date, Miller has served roughly two years in prison.

Members of Miller's family, on his behalf, have now filed a petition with the Court, requesting his immediate release based on the COVID-19 pandemic. In response, the Court appointed the Federal Defender Office to represent Miller and ordered the parties to brief whether Miller might be eligible for either home confinement under 34 U.S.C. § 60541(g) or compassionate release under 18 U.S.C. § 3582(c).

## Argument

**I.   Federal prisoners are already being considered for home confinement during the COVID-19 pandemic, and Miller should not be permitted to cut in line over more vulnerable ones.**

### A.   As of late last week, the Bureau of Prisons has new authority to place federal prisoners in home confinement.

The Bureau of Prisons is already increasing the placement of federal prisoners in home confinement based on COVID-19—and its authority to do so has now been expanded. Until Friday, 18 U.S.C. § 3624(c)(2) authorized the Bureau of Prisons "to place a prisoner in home confinement" only "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." *Id.* But the legislation

enacted last Friday now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" under § 3624(c)(2). Coronavirus Aid, Relief, and Economic Security Act, § 12003(b)(2) (enacted Mar. 27, 2020). Under this legislation, then, the Bureau of Prisons' home-confinement authority during the COVID-19 pandemic is no longer capped by the time period in § 3624(c)(2).

There's more. On Thursday evening, the Attorney General issued a memorandum to the Bureau of Prisons, directing it to prioritize its use of the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." (Attorney General's Directive to BOP, at 1 (attached as Ex. 1)). The Attorney General's directive reminds the Bureau of Prisons to consider "the statutory requirements for home confinement." (*Id.*). These statutory requirements include the requirements in 18 U.S.C. § 3624(c) and (g) for home confinement in general, as well as the requirements in 34 U.S.C. § 60541(g) for some elderly and terminally ill offenders. The directive also requires the Bureau of Prisons to identify the inmates most at risk from COVID-19 and "to consider the totality of

5

circumstances for each individual inmate" in deciding whether home confinement is appropriate. (Attorney General's Directive to BOP, at 1).

For each inmate, the directive requires the Bureau of Prisons to balance three general considerations:

1.) The inmate's age and vulnerability to COVID-19;

2.) Whether home confinement would increase, rather than decrease, the inmate's risk of contracting COVID-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(*Id.*, 1–2). Evaluating the inmate's risk to the public requires evaluating not only the inmate's crime of conviction, but also his criminal history, the resources and security level of his prison facility, his disciplinary record in prison, and his risk of recidivism. (*Id.*).

That makes sense. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of prison inmates, all at once, en masse, on the public at large. That is true in normal times, and it is particularly true given the strain on our first responders right now. Recent news reports, for instance, have confirmed that a significant percentage of local law enforcement in many cities has

6

either contracted COVID-19 or been placed under quarantine. Officers who remain on the job are increasingly stretched to their limits. There are real risks to public safety from that strain on law enforcement, and those risks will only increase if police are faced with a sudden influx of prison inmates into the community. And that is just one reason, among many, why the Bureau of Prisons has to prioritize releasing inmates who are the most vulnerable to COVID-19 and whose release would least endanger public safety.

Another reason is the dilemma that everyone will face if an incorrigible inmate is released on home confinement and then either violates his release conditions or commits additional crimes. The home confinement statutes permit—and in some instances, require—the Bureau of Prisons to revoke home confinement and re-incarcerate an inmate if he reoffends. 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). This means that if an inmate is released and then commits a serious crime, the Bureau of Prisons and the justice system will face a difficult choice: either (i) violate the statute, permit the inmate to remain free, and give him de facto authorization to continue harming the public as much as he pleases, or (ii) return the inmate to custody and risk him

bringing COVID-19 into the prison system and placing other inmates at
risk. That is all the more reason to get the initial release decision right,
and it is why the Bureau of Prisons must balance the different
considerations that govern whether an inmate should be granted home
confinement.

### B.  Even assuming Miller is eligible for home confinement, he should not be permitted to line-jump.

Because of his age and medical condition, Miller *might* be granted
home confinement under the new legislation and Attorney General's
directive. Then again, he might not. But either way, he should not be
permitted to push his way in the queue past other inmates who are less
dangerous and more vulnerable than he is. At age 69, Miller is older
than most inmates, but he is still younger than many. And even
assuming Miller's heart and liver conditions increase his risk from
illness, there are undoubtedly other inmates whose medical conditions
are more dire and who are more at risk from COVID-19—and whose
evaluation and potential release should take priority over Miller's.
Miller should not be permitted to cut in front of those other, more
vulnerable inmates.

Miller also downplays his criminal history and risk to the public, which the Bureau of Prisons must weigh here. Miller is no mass murderer or child rapist—but he's no first-time, low-level offender, either. Miller has prior burglary and drug convictions, and he was convicted here of leading a large heroin and cocaine conspiracy while illegally armed with a firearm. So it is at least questionable whether Miller would cease engaging in serious criminal conduct and abide by the terms of any home confinement, much less adhere to the CDC's social-distancing protocols. But again, that risk to the public, whatever it may be, is something that the Bureau of Prisons must evaluate alongside Miller's age and medical condition in determining whether Miller should be granted home confinement.

Further, even if the Bureau of Prisons decided to release Miller into home confinement, it could not do so immediately. To protect both the inmates and the public, any inmate who is released into home confinement must first be placed "in a mandatory 14-day quarantine." (Attorney General's Directive to BOP, at 2). The Bureau of Prisons must also ensure that any home-confinement location is suitable for release, does not place the prisoner at an even greater risk of

9

contracting COVID-19, and does not place members of the public at risk from the inmate. (*Id.*). And the Bureau of Prisons must set up location monitoring for each inmate released into home confinement. (*Id.*). That process cannot happen overnight; nor can it handle every potentially eligible inmate simultaneously. The Bureau of Prisons should therefore be permitted to prioritize the inmates who are least dangerous to the public and most vulnerable to COVID-19. Once again, Miller should not be permitted to line-jump.

In the meantime, the Bureau of Prisons is also working around the clock to protect any inmates who are not eligible for immediate release. The Bureau of Prisons is taking aggressive measures to mitigate the spread of COVID-19 in its facilities, including: (1) suspension of social visits, while giving inmates an additional 500 telephone minutes per month; (2) suspension of inmate internal movement, with limited exceptions such as for local medical trips; (3) suspension of in-person legal visits; (4) enhanced health screening for staff in areas of sustained community transmission; and (5) protocols for inmates, including screening for all new arrivals, quarantine for at-risk asymptomatic inmates, and isolation and testing of symptomatic

inmates. *See* BOP COVID-19 Action Plan. No plan is perfect, but the Bureau of Prisons' measures will help ensure that federal inmates remain protected from COVID-19 and receive any required medical care during these difficult times.

### C. The Bureau of Prisons' decisions are not subject to judicial review—much less preemptively.

In any event, the Court has no jurisdiction to review the Bureau of Prisons' decisions as to which inmates are, or are not, granted home confinement. Congress has wisely chosen not to invite hundreds of individual federal judges to all try their hands, simultaneously, at prison administration. Neither § 3624(c) nor § 60541(g) thus contains any provision for judicial review. So to the extent Miller seeks relief from this Court to order his release into home confinement, his motion must be dismissed for lack of jurisdiction. *See Kim v. United States*, 2010 WL 2813770, at *4 (D. Haw. July 14, 2010) ("[T]he statute does not provide the courts with authority to interfere with the authority of the Attorney General to administer the program."); *United States v. Garza*, 2020 WL 1485782 (S.D. Cal. Mar. 27, 2020) (recognizing that "the Court lacks authority to designate home confinement"); *United States v. Brown*, 2020 WL 1479129, at *1 (D. Md. Mar. 26, 2020) ("It is

11

inherently the authority of the Bureau of Prisons to transfer an inmate to home confinement, pursuant to 18 U.S.C. § 3624(c).").

That is especially true here, because Miller is seeking release from this Court *before* permitting the Bureau of Prisons to evaluate whether he is a good candidate for home confinement. Even in other contexts, when limited judicial review of prison administration is appropriate, inmates are required to exhaust their administrative remedies before challenging "events or conditions relating to their custody." *Little v. Hopkins*, 638 F.2d 953, 953 (6th Cir. 1981). There is no basis for Miller to preempt that administrative process here—particularly given that judicial review of any home-confinement decisions is not permitted at all. Miller, in short, is asking for relief in the wrong forum.

## II.    Miller is not eligible for compassionate release.

Section 603(b) of the First Step Act of 2018 amended 18 U.S.C. § 3582 to afford inmates the right to seek compassionate release on their own motion, when previously only the Bureau of Prisons' Director could do so. But first, defendants must request compassionate release and exhaust their administrative remedies with the Bureau of Prisons, or wait 30 days in the event the Bureau of Prisons fails to act on their

request. *See* 18 U.S.C. § 3582(c)(1)(A). Second, a court may only grant compassionate release based on an individual defendant's "extraordinary and compelling reasons," which the defendant has the burden of showing. *See United States v. Hamilton*, 715 F.3d 328, 327 (11th Cir. 2013). And third, a court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that the "defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13.

### A. The Court lacks jurisdiction because Miller has not exhausted his administrative remedies.

Miller has not yet sought compassionate release from the Bureau of Prisons based on COVID-19. Although Miller previously and unsuccessfully sought compassionate release from the Bureau of Prisons in May 2019, he has not moved for compassionate release or exhausted his administrative remedies based on his risk from COVID-19. Consequently, the Court lacks jurisdiction to consider the pending motion and must dismiss it. *See, e.g.*, *United States v. Miller*, No. 16-CR-00269, 2020 WL 113349, at *2 (D. Idaho Jan. 8, 2020) ("Miller's motion will be dismissed without prejudice. Miller is free to refile it after fully exhausting the Bureau of Prison's administrative appeals

13

process."); *United States v. Eberhart*, No. 13-CR-00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("Because defendant has not satisfied the exhaustion requirement, the court lacks authority to grant relief [based on COVID-19] under § 3582(c)(1)(A)(i).").

### B.   Miller is not eligible for compassionate release.

Even if Miller had exhausted his administrative remedies, the First Step Act did not change the substantive requirement that a sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Nor did Congress remove the directive that the Commission, not the judiciary, adopt policies regarding "what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(a)(2)(C) & (t). The Commission has fulfilled Congress's directive in U.S.S.G. § 1B1.13, which limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons."

Miller relies on his medical condition and age, but he is not eligible for compassionate release on either basis. Miller's medical

14

condition has not reached the "terminal" phase with an "end of life trajectory"; nor is Miller unable to provide "self-care" due to a medical condition "from which he is not expected to recover." U.S.S.G. § 1B1.13, application note 1(A)(i)-(ii). Rather, the concern is that Miller *could* contract COVID-19 and the virus *could* jeopardize Miller's health. Yet Miller has not contracted the illness, and his speculation is not enough to satisfy § 1B1.13's criteria. And with respect to his age, Miller does not satisfy the requirement that he "have served at least 10 years or 75 percent" of his sentence. U.S.S.G. § 1B1.13, application note 1(B)(iii). As noted above, Miller was sentenced in 2018 and has barely served a third of his term of incarceration.

Nor is Miller eligible for compassionate release based on the "other reasons" category. With respect to that category, the Bureau of Prisons has issued Program Statement 5050.50, which contains standards for eligibility that are related to but somewhat more extensive than the first three categories. Miller has not shown that he satisfies those standards, and the COVID-19 pandemic does nothing to change that. *See United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) ("Without his medical provider corroborating

either of these requirements, Herman has not shown a foundation for compassionate release based on his medical condition.").

Further, because Congress has mandated that "other reasons" for eligibility be determined by the Bureau of Prisons, not the judiciary, the Court lacks the authority to grant compassionate release based on the threat to Miller posed by the COVID-19 pandemic. *See United States v. Lynn*, 2019 WL 3805349, at *4-5 (S.D. Ala. Aug. 13, 2019); *United States v. Shields*, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. McGraw*, 2019 WL 2059488, *2 (S.D. Ind. 2019); *United States v. Washington*, 2019 WL 6220984, at *2 (E.D. Ky. Nov. 21, 2019); *United States v. Willis*, 382 F. Supp. 3d 1185, 1187 (D.N.M. 2019); *United States v. Ebbers*, 2020 WL 91399, *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Overcash*, 2019 WL 1472104, at *2 (W.D.N.C. Apr. 3, 2019); *United States v. York*, 2019 WL 3241166, at *4 (E.D. Tenn. July 18, 2019).

Even if such judicial authority existed, the COVID-19 pandemic does not qualify as the type of defendant-specific reason permitting compassionate release for a defendant like Miller. There are few

confirmed cases of COVID-19 within the Bureau of Prisons system.
Miller has not contracted COVID-19, and his medical condition is
stable, with professionals tending to his medical needs. The Bureau of
Prisons' precautionary measures have also reduced the risk from
COVID-19 to Miller and other inmates. And if COVID-19, standing
alone, qualified as an "extraordinary and compelling reason[]" for relief,
there would be no limiting principle: any defendant, no matter his
actual risk from COVID-19, would be immediately eligible for
compassionate release. Nothing in the statute or U.S.S.G. § 1B1.13
supports that unbounded interpretation.

### C. Relief is improper considering the factors set forth in 18 U.S.C. § 3553(a) and the danger Miller poses to others.

Even when a defendant is statutorily eligible for a sentence
reduction based on an "extraordinary and compelling reason,"
compassionate release is not necessarily appropriate. Before ordering
relief, courts must consider the factors set forth in 18 U.S.C. § 3553(a)
and determine that the "defendant is not a danger to the safety of any
other person or to the community." U.S.S.G. § 1B1.13.

Here, "the nature and circumstances" of Miller's crimes weigh against relief. 18 U.S.C. § 3553(a)(1). Miller was the leader and organizer of a relatively extensive heroin and cocaine conspiracy. He was also armed, despite his prior felony convictions. Those crimes posed a significant danger to the community.

Miller's "history and characteristics" likewise do not support relief. 18 U.S.C. § 3553(a)(1). Miller has prior burglary and drug convictions. And despite any arguments that his age now makes him less likely to reoffend, he was in his early 60s when he led the drug conspiracy here. Miller used his age and experience to lead and organize a criminal conspiracy. This is not a case of youthful indiscretion. Nor is there any reason to think Miller has been rehabilitated during the short time he's served on this sentence. So although Miller's age and medical conditions are appropriate considerations, they were already factored into the lenient sentence that Miller received. Relying on them as a basis for additional leniency would not reflect the seriousness of Miller's crimes, deter him from criminal activity, or protect the public. 18 U.S.C. § 3553(a)(2).

In view of the sentencing factors, compassionate release would be improper here. On top of that, based on his criminal history and offense conduct, one cannot conclude that Miller "is not a danger to the safety of any other person or to the community," U.S.S.G. § 1B1.13(2), which independently precludes relief.

## Conclusion

Miller's motion for this Court to order his release should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ Brant Cook
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9756
brant.cook@usdoj.gov

Dated: March 30, 2020

## Certificate of Service

I certify that on March 30, 2020, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Michigan using the ECF system, which will send notification of the filing to all users of record.

s/ Brant Cook
Assistant U.S. Attorney