## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---

RONALD LEE MILLER,

                    Petitioner,       Case No:  16-20222

-v-                                Honorable Arthur Tarnow

                                        Magistrate Judge R. Steven Whalen

UNITED STATES OF AMERICA,

                    Respondent.

---

| Aldous Brant Cook | Paul J. Stablein |
|---|---|
| United States Attorney's Office | Paul Stablein, PLLC |
| Assistant United States Attorney | Attorney for Defendant |
| 211 West Fort Street, Suite 2001 | 380 N Old Woodward Ave, Ste 320 |
| Detroit, Michigan 48226 | Birmingham, Michigan 48009 |
| (313) 226-9553 | (248) 540-1600 |
| brant.cook@usdoj.gov | PaulStablein@StableinLaw.com |

---

## DEFENDANT'S PETITION FOR COMPASSIONATE RELEASE FROM INCARCERATION

NOW COMES the Defendant, Ronald Lee Miller, by and through his attorney, Paul Stablein, and in support of his Motion for Compassionate Release from Incarceration, states as follows:

1.    Mr. Miller is before this Honorable Court based upon a petition submitted to the Court by Mr. Miller's family seeking consideration that Mr. Miller be released from custody because of his failing health and the current national

emergency stemming from the global spread of the novel coronavirus (COVID-19).

2.  On January 31, 2018, this Court sentenced Mr. Miller to 72 months imprisonment based upon his plea-based convictions for conspiracy to distribute and to possess with intent to distribute heroin and for being a felon in possession of a firearm.  (Doc. #337).  He is currently incarcerated at FCI Butner in Butner, North Carolina.

3.  18 U.S.C. § 3582(c)(1)(a) authorizes this Honorable Court to reduce the term of imprisonment of an inmate if it finds that "extraordinary and compelling reasons warrant such a reduction."

4.  Mr. Miller is 69 years old and suffers from multiple health problems including chronic obstructive pulmonary disease (COPD), chronic hepatitis C, cirrhosis of the liver, liver cancer, atherosclerosis and heart disease.

5.  On March 13, 2020, the President of the United States declared a national emergency pursuant to the National Emergencies Act (50 U.S.C. § 1601, *et seq.*) because the COVID-19 pandemic in the United States constitutes a national emergency beginning March 1, 2020.  Like the United States, the governor of North Carolina declared a state of emergency in the state on March 10, 2020, authorizing state funds to combat and monitor the spread of the virus.  A copy of the March 10 Executive Order No. 116 is attached hereto as **Exhibit A**.

6.      On March 14, 2020, the governor issued Executive Order No. 117, which prohibited mass gatherings to no more than one hundred people in the state and closed all public schools to limit the spread of COVID-19.  A copy of Executive Order No. 117 is attached hereto as **Exhibit B**.  On March 17, 2020, the governor ordered all bars and restaurants in the state closed to public consumption of food or beverages on their premises.  A copy of Executive Order No. 118 is attached hereto as **Exhibit C**.

7.      Because "local control measures for the emergency, taken alone, are insufficient to assure adequate protection for lives and property because the scale of the COVID-19 emergency is so great that it exceeds the capability of local government officials to cope with it," on March 23, 2020, the governor issued Executive Order No. 120, limiting gatherings of people to 50 and closing the remainder of all the states retail/entertainment venues.  A copy of Executive Order No. 120 is attached hereto as **Exhibit D**.

8.      Because of his age and severe medical conditions, Mr. Miller is at greater risk of dying than other inmates if he contracts COVID-19.  The Chinese Center for Disease Control, in an oft-cited study covering over 72,000 coronavirus cases, found that the fatality rate for patients between age 70 and 79 was nearly 10% for patients who were otherwise healthy.  *Characteristics of and Important Lessons*

*From the Coronavirus Disease 2019 (COVID-19) Outbreak in China*, Zunyou Wu, M.D., JAMA.  Found at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.  More alarming is that the US Center for Disease Control and Prevention (CDC) reports that persons over the age of 65, who suffer from chronic lung disease or who suffer from serious heart conditions are at high risk for severe illness from COVID-19.  See report entitled *Coronavirus 2019*, at   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

9.     Mr. Miller incorporates those statements of fact and conclusions of law as set forth in his accompanying Memorandum in Support of Defendant's Petition for Compassionate Release from Incarceration as if the same were more fully set forth herein.

WHEREFORE, Mr. Miller prays this Honorable Court for an order reducing his term of imprisonment to that already served and imposing a term of probation or supervised release with or without conditions that does not exceed the unserved portion of his original term of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(a) as amended by the First Step Act, P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2019).

Respectfully Submitted,

4

/s/Paul J. Stablein
Paul J. Stablein
Paul Stablein, PLLC
Attorneys for Defendant
39520 Woodward Ave, Suite 230
Bloomfield Hills, Michigan 48304
(248) 540-1600
PaulStablein@StableinLaw.com

DATED:      March 30, 2020

5

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

RONALD LEE MILLER,

                    Petitioner,        Case No:  16-20222

-v-                                Honorable Arthur Tarnow

                                   Magistrate Judge R. Steven Whalen

UNITED STATES OF AMERICA,

                    Respondent.

| Aldous Brant Cook | Paul J. Stablein |
|---|---|
| United States Attorney's Office | Paul Stablein, PLLC |
| Assistant United States Attorney | Attorney for Defendant |
| 211 West Fort Street, Suite 2001 | 380 N Old Woodward Ave, Ste 320 |
| Detroit, Michigan 48226 | Birmingham, Michigan 48009 |
| (313) 226-9553 | (248) 540-1600 |
| brant.cook@usdoj.gov | PaulStablein@StableinLaw.com |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S PETITION FOR COMPASSIONATE RELEASE FROM INCARCERATION

Defendant, Ronal Miller, respectfully moves this Honorable Court for an order reducing his sentence to the time that he has already served based on the "extraordinary and compelling reasons" discussed herein, pursuant to the newly amended 18 U.S.C. § 3582(c)(1)(A)(i).  In light of the coronavirus pandemic, which in part prompts this requested relief, Mr. Miller's motion can and should be handled without oral argument and on an expedited basis so as to save his life.

6

## INTRODUCTION

Mr. Miller is currently 69 years old and in failing health.  He is incarcerated at FCI Butner in Butner, North Carolina, as the result of this Honorable Court's sentencing on January 31, 2018.  (Doc. #337).  A review of Mr. Miller's medical records indicates that he suffers from numerous debilitating medical conditions that threaten his life expectancy.  Prior to his incarceration, Mr. Miller had been treating with the Heart & Vascular Institute, PLLC, 4160 John R Street, Detroit, Michigan, since at least September 2016.[1]  As of that date, his past medical history included hypertension (high blood pressure), hyperlipidemia (high cholesterol), coronary artery disease, hepatitis and liver cancer.  On January 24, 2017, he presented there complaining of chest pain and shortness of breath.  A few months later on May 16, 2017, Mr. Miller was seen there complaining of the same problems, but also noted leg swelling, leg pain and dizziness.  On that day the facility recorded his blood pressure at 172/110 mmHg.  Because he was not improving, doctors scheduled Mr. Miller for an echocardiogram which was performed on June 20, 2017.  The test, as indicated in the report, resulted in a finding that Mr. Miller had decreased

---

[1] This Honorable Court issued its Order Appointing the Federal Community Defender on March 24, 2020.  The Federal Community Defender contacted counsel on March 25, 2020.  Counsel contacted Mr. Miller's family and attempted to obtain as much of Mr. Miller's medical records as the family possessed, many of whom live in the State of Ohio.  Therefore, counsel's reference to the available medical records should not be taken as comprising all of the available information.

functioning of his heart.  The report indicates a finding of "Left ventricular ejection fraction estimated by 2D a 50-55 percent."  A copy of the records from the Heart & Vascular Institute is attached hereto as **Exhibit E**.  It should be noted that an earlier echocardiogram performed at the Providence Heart Institute in Southfield, Michigan, showed that on May 2, 2016, Mr. Miller had a left ventricle ejection fraction of 65 to 70 percent.  A copy of the May 2, 2016, Stress Echocardiogram Report is attached hereto as **Exhibit F**.  Therefore, it is clear that Mr. Miller's heart condition was worsening in the time leading up to his sentencing date.

According to records from the Bureau of Prisons, Mr. Miller is prescribed a total of 13 separate medications for various medical conditions including chronic obstructive pulmonary disease (COPD), high blood pressure, atherosclerosis and heart disease.  A copy of the medication reconciliation sheet from the Bureau of Prisons is Attached hereto as **Exhibit G**.  He must use an inhaler to breath after walking only a short distance, uses a cane because his legs are weak and sometimes give out and carries with him nitroglycerin tablets to take when he frequently experiences chest pain.

Because of his age and severe medical conditions, Mr. Miller is at greater risk of dying than other inmates if he contracts COVID-19.  The Chinese Center for Disease Control, in an oft-cited study covering over 72,000 coronavirus cases, found

that the fatality rate for patients between age 70 and 79 was nearly 10% for patients who were otherwise healthy. *Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVID-19) Outbreak in China*, Zunyou Wu, M.D., JAMA. Found at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. More alarming is that the US Center for Disease Control and Prevention (CDC) reports that persons over the age of 65, who suffer from chronic lung disease or who suffer from serious heart conditions are at high risk for severe illness from COVID-19. See report entitled *Coronavirus 2019*, at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

The coronavirus outbreak has led many experts to note the increased exposure of high risk populations to disease within prisons, which are like petri dishes of contagion:

| Health condition | Prevalence of health condition by population | | | |
|---|---|---|---|---|
| | Jails | State prisons | Federal prisons | United States |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

See See *Prison Policy Initiative, No Need to Wait for Pandemics*, available at:

http://www.prisonpolicy.org/blog/2020/03/06/pandemic/.

Moreover, Mr. Miller, who is 69 years old and living with these many preexisting conditions, falls within the demographic of those most highly exposed to COVID-19 disease and fatality according to guidance provided by the Centers for Disease Control and Prevention (CDC). See, e.g., *The Justice Collaborative, Guidance on COVID-19 in Release Advocacy*, available at http://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJC_CoronavirusDefenseCourts_Onesheet_02.pdf.  The CDC has issued guidance that individuals at higher risk of contracting COVID-19 - adults over 60 years old and people with chronic medical conditions such as heart disease and other conditions that weaken the immune system - take immediate preventive actions, including self-quarantine. Indeed, according to an oft-cited study by the Chinese Center for Disease Control covering over 72,000 COVID-19 cases, the fatality rate for patients between 70-79 was nearly 10%.  See *Characteristics of and Important Lessons from the Coronavirus Disease 2019 Outbreak in China*, Zunyou Wu, MD, JAMA, available at: http://jamanetwork.com/journals/jama/fullarticle/2762130.  Of course, that does not factor in Mr. Miller's additional risks from his medical conditions including COPD and coronary artery disease.  See *CDC Report, supra.*

Jurisdictions around the country have begun releasing prison populations that

are susceptible to COVID-19 exposure. See, e.g., *L.A. County Releasing Some Inmates from Jail to Combat Coronavirus*, L.A. Times, Mar. 16, 2020, available at: http://www.latimes.com/california/story/2020-03-16/la-jail-population-arrests-down-amidcoronavirus; *NYC Board of Correction Calls on City to Begin Process of Releasing Certain Prisoners in Response to COVID-19*, Sentencing Law and Policy blog, available at: http://sentencing.typepad.com/sentencing_law_and_policy/2020/03/nyc-board-of-correctioncalls-on-city-to-begin-the-process-of-releasing-certain-prisoners-asap-in-re.html.

Contrary to the Government's response to the petition, this Honorable Court has jurisdiction to entertain Mr. Miller's petition. On December 29, 2018, Mr. Miller filed the attached appeal with the warden at FCI Butner. On information and belief, Mr. Miller has heard no response to his appeal, which is well in excess of the 30 days mandated by the statute. A copy of his appeal is attached hereto as **Exhibit H**.

## ARGUMENT

The compassionate release statute was first enacted as part of the Comprehensive Crime Control Act of 1984. It provided that a district court could not modify a final term of imprisonment except in four situations, one of which was the existence of "extraordinary and compelling reasons" warranting the reduction,

11

as determined by the sentencing court.  But although the courts have the final decision-making authority over whether a sentence would be reduced, the statute imposed a gatekeeper—that authority could be invoked only upon a motion by the Director of the BOP.  Without such a motion, sentencing courts were powerless to reduce a prisoner's sentence, even if the court concluded that extraordinary and compelling reasons warranted the reduction.  18 U.S.C. § 3582(c)(1)(A)(i); see also PL 98–473 (HJRes 648), PL 98–473, 98 Stat 1837 (Oct. 12, 1984).

That changed when Congress enacted the First Step Act, which amended 18 U.S.C. § 3582(c)(1)(A).  See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018).  Under the amended statute, a court can now reduce a sentence for "extraordinary and compelling reasons" in two circumstances: (i) if the Director of the BOP files a motion requesting such relief; or (ii) "upon motion of the defendant," if the defendant has exhausted all administrative remedies to appeal the BOP's failure to bring a motion, or if 30 days has lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier.  18 U.S.C. § 3582(c)(1)(A).  *See also United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019) ("[u]nder the newly amended § 3582(c)(1)(A) [defendant] has standing to bring this motion because more than 30 days elapsed between his reduction-insentence request to the warden and a response."); *United States v.*

*Cantu-Rivera*, No. CR H-89-204, 2019 WL 2578272, at *1 (S.D. Tex. June 24, 2019) (defendant's "petition . . . meets the requirement of a lapse of 30 days from the receipt by the warden of the defendant's facility . . .The Court therefore has the authority to address the motion of the defendant.").

Here, jurisdiction exists under the First Step Act amendments because, as indicated above, Mr. Miller has exhausted his BOP administrative appeal.

Congress did not define what would constitute an "extraordinary and compelling reason" warranting a reduction of a sentence under § 3582(c).  Indeed, the legislative history confirms that it intended to grant federal sentencing courts broad discretion to make those determinations on a case-by-case basis and to reduce fundamentally unfair sentences where such reasons exist.

Congress's initial goal in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep. No. 98-225, at 52, 53 n.74 (1983).  But with the elimination of parole as a corrective measure in cases where early release is warranted, Congress recognized the need for an alternative review process. It therefore allowed for judicial reduction of certain sentences under § 3582(c):

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances.  These would include cases of severe illness, cases in which other extraordinary and compelling

> circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.
>
> *Id.* at 55–56 (emphasis added).

Put differently, rather than having the Parole Commission review every federal sentence, Congress decided to let sentencing courts decide, in a far narrower band of cases presenting extraordinary and compelling circumstances, if "there is a justification for reducing a term of imprisonment." *Id.* at 56.

The situations listed in § 3582(c) were thus intended to serve as "safety valves for modification of sentences," enabling sentence reductions when justified by factors that previously could have been addressed through the (now abolished) parole system. *Id.* at 121. This approach was intended to keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, and permitted "later review of sentences in particularly compelling situations." *Id.* (emphasis added). Notably, Congress imposed no limitations on courts' authority to make such determinations, declining to define what constitutes "extraordinary and compelling reasons" or to otherwise constrain judges' discretion. The mandate was simple: If extraordinary and compelling circumstances were present, they would "justify a reduction of an unusually long sentence." S. Rep. No. 98-225, at 55–56 (1983).

Unfortunately, the establishment of the BOP as a gatekeeper effectively eliminated the safety valve.  The BOP, which is of course part of the Department of Justice, hardly ever opened the gate.2  As a result, Congress, through the First Step Act, allowed direct access to the sentencing court once an inmate's request to the BOP has been exhausted.

Following the First Step Act's passage, courts have held that they are vested with discretion to find "extraordinary and compelling reasons" for a reduction in sentence that go beyond the technical requirements set forth in BOP regulations and USSG § 1B1.13, application note 1 (setting forth such "extraordinary and compelling reasons" as "terminal illness" and a guideline that a prisoner over 65 years old should be release early when he has "served at least 10 years or 75 percent of his sentence").  *See United States v. Redd*, 97-cr-6, 2020 U.S. Dist. LEXIS 45977 at *7-12 (E.D. Va. Mar. 16, 2020) (district courts vested with discretion to find "extraordinary and compelling reasons" beyond the technical requirements of the guidelines manual or BOP regulations); *Cantu, supra*, at *5; *Cantu-Rivera, supra*, at *2 n.1; *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6

---

2 See, e.g., *The Answer is No: Too Little Compassionate Release in US Federal Prisons*, Human Rights Watch, 2 (Nov. 2012), https://www.hrw.org/sites/default/files/reports/us1112ForUploadSm.pdf (noting that between 1992 and 2012, the average annual number of prisoners who received compassionate release following a motion by the BOP was less than two dozen).

(M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

In addition to the above-mentioned reasons, this Honorable Court must of course take into consideration the current pandemic. Last Saturday, March 14, 2020, the Bureau of Prisons announced their first positive case of COVID-19 in New York. The following day, two more cases were identified. As of March 29, 2020, the BOP has identified 19 inmates who have tested positive and 19 staff members. The virus arrived at Butner yesterday. https://www.bop.gov/coronavirus/index.jsp. Meanwhile, the BOP is continuing to transfer inmates between facilities using only a temperature check. See *BOP Implementing Modified Operations*, *id*. It continues to transfer inmates to and from local medical facilities, *id*., as no doubt is happening at FCI Butner. And because symptoms can arise days and weeks after exposure and contagion, as confirmed cases appear in a given facility, the BOP will necessarily be playing a game of catchup.[3]

_____

[3] This is already becoming clear. See *"Some 'low-risk' inmates to be released, NYC Mayor de Blasio said"* (Mar 22, 2020), https://abc7ny.com/health/some-low-riskinmates-to-be-released-due-to-coronavirus/6038522/. This article reflects that the inmate with a confirmed case in Brooklyn was in the facility for two days before he started complaining of symptoms and was taken to the hospital. On Sunday, two more cases were identified in FCC Oakdale, in Louisiana. *Id*. A staff member at another facility has tested positive and didn't have contact with inmates

Medical professionals behind bars are sounding the alarm as well.

Craig McCarthy, *"Top Rikers Doctor: Coronavirus 'Storm is Coming,'"* N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . . Please let as many out as you possibly can."). Rikers, as an example, went from zero cases to two confirmed inmate cases to 21 confirmed inmate cases nearly overnight. *See* Jan Ransom, *"'A Storm is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails,"* N.Y. Times, Mar. 21, 2020.

The Government's response indicates that Mr. Miller should not be allowed to "jump the line." While all inmates are vulnerable to catching COVID-19, certain populations are at special risk. As of today, the CDC has indicated that those over 65 years old are at a higher risk for severe illness. See CDC: Morbidity and Mortality Weekly Report (Mar. 18, 2020) ("Overall, 31% of cases, 45% of hospitalizations, 53% of ICU admissions, and 80% of deaths associated with COVID-19 were among adults aged ≥65 years with the highest percentage of severe outcomes among persons aged ≥85 years.").

Mr. Miller is in the heart of those most vulnerable to suffering the most severe

after he tested positive. *Id.*

17

outcomes reported. He is 69 years old, and he suffers from numerous debilitating medical conditions, as noted above.

Should this Honorable Court see fit to order the release of Mr. Miller, he will self-quarantine at his home with his wife, Darlene, and their daughter, age 27, and their son, age 23. The family will reside at their home at 14060 East State Fair, Detroit Michigan 48205.

The Court's order of appointment also ordered the parties to address Mr. Miller's eligibility under "the Elderly and Family Reunification for Certain Offenders Pilot Program" as set forth in 34 U.S.C. § 60541(g). Mr. Miller is eligible for such consideration. The statute states in pertinent part:

> (g) Elderly and family reunification for certain nonviolent offenders pilot program
>> (1) Program authorized
>>> (A) In general
>> The Attorney General shall conduct a pilot program to determine the effectiveness of removing eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities and placing such offenders on home detention until the expiration of the prison term to which the offender was sentenced.
>>> (B) Placement in home detention
>> In carrying out a pilot program as described in subparagraph (A), the Attorney General may release some or all eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities to home detention, upon written request from either the Bureau of Prisons or an eligible elderly offender or eligible terminally ill offender.
>>>        *        *        *

(3) Scope of pilot program
A pilot program under paragraph (1) shall be conducted through Bureau of Prisons facilities designated by the Attorney General as appropriate for the pilot program and shall be carried out during fiscal years 2019 through 2023.

Section (g)(5)(A) defines the term "eligible elderly offender" as:

(i) who is not less than 60 years of age;
(ii) who is serving a term of imprisonment that is not life imprisonment based on conviction for an offense or offenses that do not include any crime of violence (as defined in section 16 of Title 18), sex offense (as defined in section 20911(5) of this title), offense described in section 2332b(g)(5)(B) of Title 18, or offense under chapter 37 of Title 18, and has served 2/3 of the term of imprisonment to which the offender was sentenced;
(iii) who has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense described in clause (ii);
(iv) who has not been determined by the Bureau of Prisons, on the basis of information the Bureau uses to make custody classifications, and in the sole discretion of the Bureau, to have a history of violence, or of engaging in conduct constituting a sex offense or other offense described in clause (ii);
(v) who has not escaped, or attempted to escape, from a Bureau of Prisons institution;
(vi) with respect to whom the Bureau of Prisons has determined that release to home detention under this section will result in a substantial net reduction of costs to the Federal Government; and
(vii) who has been determined by the Bureau of Prisons to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention.

Though Mr. Miller meets every other criteria identified by Congress for eligibility under the pilot program, and reunification with his family prior to any worsening of his health concerns would serve the apparent purposes of the act, Mr.

19

Miller has served a little over two years (1/3) of this Honorable Court's six-year term of incarceration.  Subsection (g)(5)(A)(ii) defines those eligible as inmates having served 2/3 of the Court's sentence.  Therefore, absent a deviation by the Court, it appears Mr. Miller does not meet the definition of eligible offenders that may take advantage of the program.

Nonetheless, Mr. Miller for all of the reasons stated above is eligible for release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  The people of this nation are suffering an unprecedented attack on the health, the economy and the very infrastructure of society as a result of the rapid spread of this deadly virus.  Mr. Miller is sick, and, if infected with the virus, will undoubtedly suffer the most extreme unfavorable outcome as a result.  He struggles to breath currently – add in the added respiratory effects of the pneumonia that accompanies this virus, and it is unlikely that Mr. Miller will survive.  We are living in extraordinary times.  This Honorable Court should find extraordinary and compelling reasons that justify the compassionate release of Mr. Miller.

WHEREFORE, Mr. Miller prays this Honorable Court for an order reducing his term of imprisonment to that already served and imposing a term of probation or supervised release with or without conditions that does not exceed the unserved portion of his original term of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(a)

as amended by the First Step Act, P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2019).

Respectfully Submitted,


/s/Paul J. Stablein
Paul J. Stablein
Paul Stablein, PLLC
Attorneys for Defendant
39520 Woodward Ave, Suite 230
Bloomfield Hills, Michigan 48304
(248) 540-1600
PaulStablein@StableinLaw.com

DATED:      March 30, 2020

21